IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 15-cr-139 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| CHERYL SPEAR | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Cheryl Spear was charged with presenting a false claim, 18 U.S.C. § 287, and theft of government funds, 18 U.S.C. § 641, in connection with an alleged scheme to defraud the Internal Revenue Service ("IRS") of a false $135,000 tax refund. [See 1.] Defendant voluntarily waived her right to a jury trial [38] and elected to proceed with a bench trial, which began on May 23, 2016 and concluded on May 24, 2016. [See 40, 41.] Following trial, both parties filed post-trial briefs. [See 44, 45, 46, 47.]

After carefully considering all of the parties' submissions, their stipulations, and the evidence adduced at trial, the Court sets forth below its findings of fact and conclusions of law pursuant to Federal Rule Criminal Procedure 23(c). To the extent, if any, that findings of fact, as stated, may be considered conclusions of law, they should be deemed conclusions of law. Similarly, to the extent that matters expressed as conclusions of law may be considered findings of fact, they should be deemed findings of fact. In the end, the Court concludes that the Government established beyond a reasonable doubt that Defendant knowingly presented a false claim in violation of 18 U.S.C. § 287 and knowingly committed theft of government funds in violation of 18 U.S.C. § 641. Accordingly, the Court finds Defendant guilty of both charges in the Indictment [1]. This matter is set for status hearing on December 1, 2016 at 9:00 a.m.

**I.      Findings of Fact**

In the three years leading up to 2009, Defendant Cheryl Spear filed individual tax returns that were roughly similar. In tax year 2006, Defendant filed a Form 1040 for an individual income tax return that reported an adjusted gross income of $36,352 and requested a tax refund of $2,359. (Gov. Ex. 101; Tr. 22–23, May 23, 2016 a.m.) In tax year 2007, Defendant's Form 1040 reported an adjusted gross income of $19,283 and requested a tax refund of $6,609. (Gov. Ex. 102; Tr. 23–24, May 23, 2016 a.m.) That year, she also reported the income from her towing business, Lyrehc Towing, as $5,250 in adjusted gross income and $8,150 in total expenses, which amounted to a business loss of $2,900. (Gov. Ex. 102 at 7; Tr. 24, May 23, 2016 a.m.) In tax year 2008, Defendant's Form 1040 reported an adjusted gross income of $7,076 and requested a tax refund of $3,277, but did not report any income or losses associated with her business. (Gov. Ex. 103; Tr. 25, May 23, 2016 a.m.) Defendant listed H&R Block as her third-party tax preparer on all three of these returns. (Gov. Exs. 101 at 3, 102 at 3, 103 at 3.) In 2006, her tax preparation fee was $242. (Gov. Ex. 101 at 5; Tr. 23, May 23, 2016 a.m.)

Defendant deviated significantly from this past practice for tax year 2009. In December 2009, the IRS received an online application for an Employer Identification Number (EIN) for the "Cheryl Spear" trust. (Gov. Ex. 113; Tr. 27–29, May 23, 2016 a.m.) Just like a social security number for a natural person, an EIN serves as the tax identification number for a trust or corporate entity. (Tr. 79, May 23, 2016 p.m.) The EIN application identified the "TTEE" or trustee as "Cheryl L. Spear" and listed Defendant's home address and social security number. (Gov. Ex. 113; Tr. 29, May 23, 2016 a.m.) The IRS issued an EIN for this trust based on this application. (Gov. Ex. 113.)

2

On January 6, 2010, the IRS received a Form 1041—the income tax form used for estates and trusts—on behalf of the "Cheryl McCain" trust for tax year 2009. (Gov. Ex. 105.) Defendant's maiden name is Cheryl McCain. (Tr. 86, May 23, 2016 p.m.) The form lists "Cheryl L. Spear" as "Trustee," Defendant's home address, and the same EIN from the December 2009 EIN application for the "Cheryl Spear" trust. (Gov. Ex. 105; Tr. 30, May 23, 2016 a.m.) The box for "simple trust" is checked. (Gov. Ex. 105.) According to IRS revenue agent Paul Ponzo, the trustee is responsible for signing the Form 1041. (Tr. 51, May 23, 2016 a.m.) Here, the Form 1041 is signed with Cheryl Spear's name and dated January 4, 2010. (Gov. Ex. 105.)

There is no dispute that the Form 1041 contains several falsehoods. First, the "Cheryl McCain" trust claimed $405,000 in income for 2009 notwithstanding the fact that the trust was created on December 14, 2009—two weeks before the end of the tax year. (Gov. Ex. 105; Tr. 30–31, May 23, 2016 a.m.) The trust did not identify the source of that income despite a requirement to do so. (Gov. Ex. 105; Tr. 53, May 23, 2016 a.m.) Second, the trust claimed that this entire $405,000 amount was owed as "fiduciary fees" to the trustee, "Cheryl L. Spear." (Gov. Ex. 105; Tr. 53, May 23, 2016 a.m.) Typically, fiduciary fees are paid for work performed by the fiduciary, while income from a simple trust is distributed to the trust's beneficiaries. (Tr. 50, 54, May 23, 2016 a.m.) Agent Ponzo testified that it would be "unusual" that all of a trust's income would be paid as a fiduciary fee. *Id.* He also explained that fiduciary fees are income that must be reported on the fiduciary's personal Form 1040. *Id.* Third, the trust claimed a $4,950 exemption. (Gov. Ex. 105.) The maximum exemption permitted by law for a simple trust is $300. (Tr. 55, May 23, 2016 a.m.) Fourth, and most importantly, the trust represented that the trustee was due $135,000 as a refund because this amount had been withheld as federal

3

income taxes during its two-week existence. (Gov. Ex. 105; Tr. 31, 56, May 23, 2016 a.m.) The IRS has no records that any federal income taxes were withheld from this trust in 2009, and thus no refund was actually owed. (Gov. Ex. 119; Tr. 34–35, 57, May 23, 2016 a.m.)

One month after this Form 1041 was filed, Defendant filed a Form 1040A representing her personal tax return for 2009. (Gov. Ex. 118.) That return lists her adjusted gross income as $29,340, requests a tax refund of $4,041, and did not report any business income or losses. *Id.* Defendant did not report $405,000 as fiduciary fee income. (*Id.*; Tr. 55, May 23, 2016 a.m.) Like her other individual tax returns from 2006 through 2008, Defendant listed H&R Block as her third-party tax preparer. *Id.* at 3.

The IRS did not discover the problems with the Form 1041 right away. Instead, it issued a refund check dated March 16, 2010 to "Cheryl Spear, Cheryl L. Spear TTEE" for $135,000, which it mailed to Defendant's home. (Gov. Ex. 106; Tr. 81, May 23, 2016 p.m.) The right-hand side of the check includes the phrase "CNCNATIF-1041 REF," which denotes a Form 1041 refund mailed to the IRS's Cincinnati Service Center. (Tr. 33, May 23, 2016 a.m.) Below that phrase is the number "12/09," which stands for December 2009. *Id.*

Defendant flew to Chicago from Florida once the IRS issued the refund check. (Tr. 90–93, May 23, 2016 p.m.) She did not call H&R Block about the refund. (Tr. 92–93, May 23, 2016 p.m.) She purportedly called the IRS to "verify" the check, but never spoke with a live person. (Tr. 136–37, 143, May 23, 2016 p.m.) Instead, on March 24, 2010, Defendant traveled to Chase Bank in Chicago—where she had personal checking and savings accounts—to open a new trust checking account under the name "Cheryl L Spear TTEE, Cheryl L Spear Trustee." (Gov. Exs. 303, 304.) To open this account, Defendant provided her Florida driver's license, a debit card, and social security number for identification. (Gov. Ex. 303; Tr. 65–66, May 23,

4

2016 a.m.) She listed her home address on the account. (Gov. Ex. 303; Tr. 83, May 23, 2016 p.m.) She also provided a copy of a "Deed of Trust Contract" that appeared to create a trust. (Gov. Ex. 307 at 11.) This document, which Defendant signed, provides that the "Trustee shall receive annual compensation of $1,000.00 (One Thousand Dollars), or quid pro quo, substance for substance, on an equal exchange of $1,000.00 (One Thousand Dollars), payable in silver or gold via monthly, bi-annual or annual payments for services to the Trust."[1] *Id.* at 6.

After opening the trust checking account, Defendant endorsed the back of the $135,000 check and deposited it into the account. (Gov. Exs. 106, 306; Tr. 82, May 23, 2016 p.m.) The check was negotiated and paid by the United States Department of the Treasury on March 26, 2010. (Gov. Ex. 106; Tr. 34, May 23, 2016 a.m.; Tr. 82, May 23, 2016 p.m.)

Defendant did not save this money for a rainy day. She withdrew $5,031.95 from the account during the last five days of March 2010, $47,072.70 in April, $81,038.14 in May, and $3,926.22 in June. (Gov. Ex. 603.) On June 10, only $14.87 was left in her account. *Id.* These withdrawals were mostly in the form of debit card purchases and cash withdrawals. (Gov. Exs. 306, 602.) But Defendant also transferred more than $30,000 to her personal checking account and gave tens of thousands of dollars to her family members for use on cars and home repairs. (Gov. Exs. 306, 602, 604; Tr. 110–16, May 23, 2016 p.m.) More than $65,000 was withdrawn from the trust account in a single week in May—an amount just shy of Defendant's total annual income from the prior three years *combined*. (Gov. Exs. 101–103, 602 at 2.)

On June 16, 2010, the IRS's Frivolous Return Program sent a Form 3176C letter—also referred to as a frivolous filing letter—to Defendant's home address. (Gov. Ex. 108; Tr. 36–37, May 23, 2016 a.m.) The taxpayer identification number listed on the top of the form is

---

[1] The Court does not quote this language to suggest that it has any legal force or meaning, but to show Defendant's knowledge (or at least belief) that the trust permitted only $1,000 in annual fiduciary fees.

Defendant's social security number, not the trust's EIN. (Gov. Ex. 108; Tr. 37, May 23, 2016 a.m.) The letter stated that the IRS deemed the trust's 2009 Form 1041 to be frivolous. (Gov. Ex. 108.) The IRS notified Defendant that if she did not file corrected tax returns with 30 days or if she submitted another frivolous response, she would be assessed a $5,000 penalty per return. *Id.* Defendant did not submit a corrected return or pay the $5,000. Instead, she stamped each page of the letter with the phrase "Accepted for value and returned for value by authorized representative," signed it, and sent it back to the IRS.[2] (Gov. Ex. 108; Tr. 37–38, May 23, 2016 a.m.) Needless to say, the IRS did not consider this an acceptable response and assessed the $5,000 penalty against Defendant. (Gov. Ex. 105; Tr. 36–38, May 23, 2016 a.m.) Ultimately, tax year 2009 is the one and only year that the "Cheryl Spear" or "Cheryl McCain" trust ever filed a Form 1041. (Gov. 110; Tr. 35, May 23, 2016 a.m.)

In 2014, IRS criminal investigation agent Denis Umali began investigating Defendant. (Tr. 76–78, May 23, 2016 p.m.) He conducted in-person interviews with Defendant on June 17 and December 1, 2014, and phone interviews on July 8, 2014. (Tr. 85, 93–94, May 23, 2016 p.m.) During the first interview, Defendant admitted that the Form 1041 included her maiden name and address, but denied that it was her signature on the form or that she had seen the form before.[3] (Tr. 86, May 23, 2016 p.m.) She also could not recall obtaining the EIN listed on the form. (Tr. 87, May 23, 2016 p.m.) Defendant confirmed that she had never earned $405,000, but claimed that she had received a tax refund of $75,000 or $80,000. *Id.*

---

[2] One IRS witness had seen this stamped phrase "frequently" on correspondence with people affiliated with the Moorish Science Temple, some of whom have been investigated for filing frivolous or fraudulent tax returns. (Tr. 43–44, May 23, 2016 a.m.) Both Agent Ponzo and IRS criminal investigation agent Denis Umali testified that the problems with Defendant's Form 1041 are commonly found in cases involving the Moorish Science Temple. (Tr. 59–60, May 23, 2016 a.m.; Tr. 120, May 23, 2016 p.m.)

[3] The IRS did not perform a formal forensic analysis of this signature or test the Form 1041 for fingerprints. (Tr. 127–28, May 23, 2016 p.m.)

Defendant told Agent Umali that she had heard "through word of mouth or through a flyer" about Saadiq Bey, a business accountant or tax preparer. (Tr. 88, 129, May 23, 2016 p.m.) "Bey" is a last name adopted by some followers of the Moorish Science Temple. (Tr. 120, May 23, 2016 p.m.) Defendant knew that Bey was associated with this group and mentioned this information to Agent Umali. (Tr. 129–30, May 23, 2016 p.m.) In 2009, Defendant met Bey at a Starbucks, and he offered to help her write off a loss from her tow truck business to receive a tax refund of $20,000 or $30,000. (Tr. 88–89, May 23, 2016 p.m.) Defendant claimed that this loss occurred because her business failed after she became injured, which occurred shortly after purchasing a tow truck for $80,000 or $90,000. *Id.* In fact, Michael Fresso, owner of Town and Country Motors, testified that he sold a used 2001 tow truck to Defendant in late-June 2007 for $20,000 in cash. (Gov. Ex. 401; Tr. 68–72, May 23, 2016 a.m.) Defendant told Agent Umali that she signed "some sort of form that had profits or losses at the top" and provided Bey with information about her tow truck business. (Tr. 89, May 23, 2016 p.m.) Bey purportedly gave her an IRS phone number to check on the status of the refund. (Tr. 89–90, May 23, 2016 p.m.)

Agent Umali then showed Defendant the $135,000 refund check (Gov. Ex. 106), and she confirmed that she had signed this check. (Tr. 90, May 23, 2016 p.m.) Defendant stated that, in March 2010, Bey called her while she was living in Florida to say that he had her refund check in his hands. *Id.* Defendant believed that Bey "must have waited around for the mailman to deliver" the refund check because there was no one living at her address at the time and her mailbox is behind a locked front entry door. (Tr. 91, May 23, 2016 p.m.) Defendant said that she flew back to Chicago to meet Bey at Chase Bank, but could not recall opening a new trust account. (Tr. 93, May 23, 2016 p.m.) Agent Umali then showed her the form that she used to open the account (Gov. Ex. 303), and she confirmed that it was her signature on the form. (Tr.

7

93, May 23, 2016 p.m.) Defendant further stated that she made arrangements to pay Bey $20,000 and another of his associates $15,000, which she was supposed to do after the money from the refund check cleared. (Tr. 93–94, May 23, 2016 p.m.)

On July 8, 2014, Agent Umali and Defendant spoke by phone. (Tr. 94, May 23, 2016 p.m.) On this call, Defendant indicated that she formed her tow truck business in 2008, but she never filed a tax return for the business. *Id.* She repeated that Bey had offered to help her with a tax write-off for losses that she had suffered from this business. *Id.* Defendant also "wonder[ed] aloud" to Agent Umali "if there was possibly a way to sue" Bey "for using her personal information." (Tr. 117, May 23, 2016 p.m.)

Defendant was interviewed again on December 1, 2014. (Tr. 95, May 23, 2016 p.m.) In this interview, Defendant stated that she initially met with Bey to discuss "debt elimination." *Id.* Defendant then offered a new story about the refund check, claiming that her son was still living at her Illinois address, opened her mail, and sent the check to her in Florida. (Tr. 95–96, May 23, 2016 p.m.) Defendant then called Bey to inform him that she had received the check and they discussed meeting at Chase Bank in Chicago. (Tr. 96, May 23, 2016 p.m.) Defendant did not say that she found the check suspicious. *Id.* Defendant again confirmed that her signature, driver's license, and social security number were on the paperwork opening the trust checking account at Chase Bank. (Tr. 97, May 23, 2016 p.m.) Defendant said that Bey brought the "Deed of Trust Contract" to the bank, which may have already been notarized before she signed it.[4]

---

[4] This was not the only document of questionable legal significance involving Defendant and Bey. On December 3, 2009, a Uniform Commercial Code ("UCC") Financing Statement was filed with Kentucky's Secretary of State identifying "Cheryl Spear:Bey" as the secured party. (Gov. Ex. 201.) Defendant's home address is list as the "Illinois Republic," and the filing purported to, among other things, deem "accepted for value" and "exempt from levy" Defendant's "Certificate of Birth, Social Security Number, Driver's License, Employer Identification number, [and] UCC contact trust account." *Id.* Defendant told Agent Umali that she had met Bey at a library to complete this filing and gave him the

(Tr. 98, May 23, 2016 p.m.) She now said that she had agreed to pay Bey $13,700, and his assistant was to be paid $3,000 out of this amount. *Id.* In fact, Defendant's bank records show that she withdrew $11,500 on April 2, 2010, and the same amount was deposited into Bey's account that day. (Gov. Exs. 306 at 11, 309 at 104; Tr. 108–10, May 23, 2016 p.m.; see also Gov. Ex. 602.) Defendant also confirmed that she had received the IRS's frivolous filing letter regarding the 2009 Form 1041 and discussed her response with Bey—not H&R Block or the IRS.[5] (Tr. 99, May 23, 2016 p.m.) Defendant could not be certain, but said "it looked like it might have been her signature" on the letter back to the IRS. (Tr. 100, May 23, 2016 p.m.)

On March 19, 2015, Defendant was indicted and charged with presenting a false claim in violation of 18 U.S.C. § 287 and theft of government funds in violation of 18 U.S.C. § 641.

## II. Analysis & Conclusions of Law

### A. The Elements of the Charged Offenses

Count One of the Indictment [1] charges Defendant with violating 18 U.S.C. § 287. The statute provides in pertinent part:

> Whoever makes or presents to any person or officer in the * * * service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine.

18 U.S.C. § 287.

The parties agree that the Government must prove that "(1) [Defendant] presented [a] claim[] to the IRS; (2) th[at] claim[] w[as] false, fictitious, or fraudulent, and (3) [Defendant]

---

$10 money order required for the filing. (Tr. 102, May 23, 2016 p.m.) Her understanding was that this would be "similar to filing for bankruptcy but without the associated costs." *Id.*

[5] On cross-examination, Agent Umali testified that Defendant had received another IRS letter for unreported retirement income on her personal income taxes. In that instance, Defendant "went to an accountant" and "tried to resolve that with the IRS." (Tr. 122–23, May 23, 2016 p.m.)

knew the claim[] w[as] false, fictitious, or fraudulent." *United States v. Clarke*, 801 F.3d 824, 827 (7th Cir. 2015). Defendant posits, however, that a fourth element of "intent to defraud" is required. [44, at 3.] For support, she cites the Seventh Circuit's Pattern Criminal Jury Instructions for Section 287, which list the first three elements above without brackets but includes a fourth element—"The defendant acted with intent to defraud"—in brackets. See Pattern Criminal Jury Instructions of the Seventh Circuit for 18 U.S.C. § 287 at 161 (2012). The Committee Comment states that "[t]he fourth element (intent to defraud) is bracketed because it is unsettled in this Circuit whether proof of intent to defraud is required under section 287." *Id.*

The Comment describes four Seventh Circuit cases that bear on the "intent to defraud" issue. It first identifies two 1991 cases in which the Seventh Circuit either "assumed" intent to defraud was an element or found that jury instructions including with an "intent to defraud" element "accurately presented the jury with the fundamental questions bearing upon the defendant's guilt or innocence." *Id.* at 161–62 (citing *United States v. Nazon*, 940 F.2d 255 (7th Cir. 1991), and *United States v. Haddon*, 927 F.2d 942 (7th Cir. 1991)). The Comment next describes *United States v. Catton*, which was decided five years after *Nazon* and *Haddon* and held that "[i]t is implicit in the filing of a knowingly false claim that the claimant intends to defraud the government, and hence unnecessary to charge willfulness separately." 89 F.3d 387, 392 (7th Cir. 1996). According to the Comment, *Catton* "equated" willfulness and intent to defraud. See 7th Cir. Pattern Instruction for 18 U.S.C. § 287, Committee Comment at 162 (citing *Catton*, 89 F.3d at 392 ("the making of a knowingly false *claim* might seem inherently willful, inherently intended to defraud, making an instruction on willfulness otiose")). Finally, the Comment cites a 1997 unpublished Seventh Circuit opinion holding that "[p]roof of specific intent to defraud the government is not required to convict under § 287"—a conclusion the court

characterized as merely restating "our holding in [*Catton*]." *Id.* (quoting *United States v. Strong*, 114 F.3d 1192, at *2 (7th Cir. 1997)).

Against this backdrop, the Government relies on *Clarke*—a 2015 case decided three years after the pattern criminal instructions were published. In *Clarke*, the defendant argued on appeal that the trial court erred by declining to give a "good faith" jury instruction modeled on Seventh Circuit Pattern Criminal Instruction 6.10. See Brief for Defendant-Appellant at *9–10, *United States v. Clarke*, 2015 WL 740995 (7th Cir. Feb. 9, 2015). The Committee Comment to Instruction 6.10 explains that "this instruction should not be used in cases in which the government is required only to prove that the defendant acted 'knowingly.' Rather, it should be used in cases in which the government must prove some form of 'specific intent,' *such as intent to defraud or willfulness*." 7th Cir. Pattern Instruction 6.10, Committee Comment at 97 (emphasis added). The Seventh Circuit rejected the defendant's argument and held that he "was not entitled to an instruction on good faith" because "willfulness is not an element of a § 287 claim." *Clarke*, 801 F.3d at 828 (applying *Catton*). "The government need only prove that Clarke made a claim upon the United States knowing that the claim was false." *Id.*

Defendant, in contrast, makes no effort to substantiate her position that "intent to defraud" is an element under Section 287. She omits any mention of the fact that the fourth element is bracketed in the pattern instruction. [44, at 3.] She does not explain how *Catton* or *Strong* can be reconciled with treating intent to defraud as an element. [See generally 44, 47.] And she fails to discuss *Clarke* at all. Yet *Clarke*'s holding that good faith instructions are inappropriate in Section 287 cases is premised on the fact that the government does not need to prove "specific intent," such as "intent to defraud." See 7th Cir. Pattern Instruction 6.10, Committee Comment at 97. Otherwise, the defendant in *Clarke* would have been eligible to

11

receive this instruction. Moreover, *Clarke* describes only three elements under Section 287 and reaffirmed that the government "need only prove" knowledge of the claim's falsity. See 801 F.3d at 827–28. Thus, the Court agrees that "intent to defraud" is not an element of Section 287 under *Clarke*, *Catton*, and *Strong*.[6]

In addition to Count One, Count Two of the Indictment charges Defendant with violating 18 U.S.C. § 641. Here, the parties agree on the elements: the Government must prove that (1) the money described in the indictment belonged to the United States; (2) the money had a value exceeding $1,000; (3) Defendant knowingly converted that money to her own use; and (4) Defendant did so knowingly with intent to deprive the owner of the use or benefit of that money. 7th Cir. Pattern Instruction for § 641 at 196; [45, at 12]; [44, at 3–4].

B.  **Defendant's Liability**

In light of the facts found and law outlined above, the Court concludes that Defendant is guilty of presenting a false claim, 18 U.S.C. § 287, and theft of government funds, 18 U.S.C. § 641, as alleged in Counts One and Two of the Indictment. The facts as found above establish beyond a reasonable doubt that Defendant knowingly presented a false claim to the IRS on

---

[6] Tellingly, Defendant never identifies any aspect of this case that turns on an "intent to defraud" element separate and apart from the "knowledge" element. During trial, Defendant consistently framed the sole issue in dispute as whether the Government has proven "knowledge." (See, *e.g.*, Tr. 165, May 24, 2016 p.m. ("[T]here's no denial that she received a check, no denial that she signed the check, deposited the check and spent the money. But there's also no evidence of the second important legal aspect of this case, which is knowledge."); *id.* at 169 (Court: "Is there anything else about what inferences I should be drawing from the evidence that would lead to a not guilty verdict in this case? I guess that's what -- I think you guys have all identified the key issue in the case. It's the knowledge element; that's the key issue." Defendant's Counsel: "Right."); *id.* at 173 ("So based upon that, your Honor, I think you have stated clearly that this case does focus clearly on the element of [Defendant's] knowledge of whether or not she was entitled to that check."). In fact, the Defendant never even used the words "intent" or "intent to defraud" in her closing argument. Her posttrial briefs are similarly without any specific argument directed to the "intent to defraud" element. [*Cf.* 47, at 3 ("The circumstantial evidence presented by the government fails to support a reasonable inference that [Defendant] possessed such knowledge beyond a reasonable doubt.").] In any event, it is difficult to see how this "element," even if required, would not also be satisfied under the facts of this case once the government proves—as it has—that Defendant knowingly presented a false refund check for payment to the IRS.

March 24, 2010 (Count One) and that Defendant knowingly converted more than $1,000 in money belonging to the United States for her own use and did so knowingly with intent to deprive the United States of the use or benefit of that money (Count Two).

### 1. Count One

Defendant does not dispute that the Government has proven elements one (claim presentment) and two (falsity) of Section 287 beyond a reasonable doubt. (See Tr. 165, May 24, 2016 p.m.) First, Defendant presented a claim for payment to the federal government when she endorsed the $135,000 tax refund check and deposited it into her Chase Bank trust checking account on March 24, 2010. (Gov. Exs. 106, 306; Tr. 97–98, May 23, 2016 p.m.) The Treasury Department paid that check on March 26, 2010. (Gov. Ex. 106; Tr. 34, May 23, 2016 a.m.) Presenting or cashing a tax refund check qualifies as presentment of a "claim" under Section 287. *Clarke*, 801 F.3d at 826; accord *United States v. Pointon*, 590 F. App'x 920, 924 (11th Cir. 2014); *United States v. Branker*, 395 F.2d 881, 889 (2d Cir. 1968). Second, this claim was "false" because Defendant was not entitled to a $135,000 tax refund for tax year 2009. The Form 1041 that prompted the IRS to issue this check falsely represented that Defendant's trust had earned $405,000 in income over two weeks in December 2009, this entire amount was due to Defendant as "fiduciary fees," and Defendant was owed a refund of $135,000 based on the trust's federal income tax withholding. (Gov. Ex. 105; Tr. 30–31, 50–57, May 23, 2016 a.m.) No refund was owed to Defendant because no federal income taxes were withheld from this "trust" in 2009. (Gov. Ex. 119; Tr. 34–35, 57, May 23, 2016 a.m.) Thus, Defendant presented a false claim for payment to a department of the United States.

The only dispute here is whether the Government has proven beyond a reasonable doubt that Defendant knew that she was not entitled to a $135,000 tax refund when she presented her refund check to the government for payment.[7] The Government has satisfied its burden.

To start, the $135,000 refund check was several multiples above Defendant's annual *income* to say nothing of her past *refund*s. Between 2006 and 2008, Defendant never reported more than $36,352 in adjusted gross income and never requested a tax refund of more than $6,609. (Gov. Exs. 101–103.) There is no evidence that Defendant had reason to think that her earnings had dramatically changed in 2009. In fact, her personal tax returns for 2009 listed only $29,340 in adjusted gross income and sought a tax refund for $4,041. (Gov. Ex. 118.) Defendant also signed the "Deed of Trust Contract" in connection with opening her Chase Bank trust checking account. (Gov. Ex. 307.) Putting aside its validity, this document informed Defendant that she could receive only $1,000 in annual compensation as Trustee (*id.* at 6), not the $405,000 in fiduciary fees claimed on the Form 1041 (Gov. Ex. 105) or anything close to $135,000 as an income tax refund. In fact, she had no reason to think that her two-week-old trust had earned any income in 2009 or evidence that she thought otherwise. In short, there is simply no explanation as to how Defendant could have genuinely thought that she was entitled to this money. The fact that this refund amount was "'patently false and utterly groundless' is sufficient to demonstrate the defendant's knowledge of the falsity of her claims in violation of 18 U.S.C. § 287." *Clarke*, 801 F.3d at 827–28 (holding that defendant's tax returns "demonstrate that knowledge [of falsity] on their face" where they listed income and fiduciary fees of $900,000 "without identifying how this income was obtained" and claiming withholdings of $300,000

---

[7] The Government expressly disclaims its reliance an "ostrich theory" to prove knowledge, such as by showing Defendant strongly suspected the falsity of her tax returns but deliberately avoided learning the truth. [46, at 2.] The Court does not address whether the Government's proof meets this standard.

14

even though "no such funds were ever withheld"); *see also United States v. Ferguson*, 793 F.2d 828, 831 (7th Cir. 1986).

Furthermore, substantial evidence shows that Defendant knew this tax return was false. Defendant blew through the entire $135,000 in less than three months. (Gov. Ex. 603.) Significantly, this spending spree came on the heels of Defendant's professed concerns to Bey that she might need to file for bankruptcy, which was the impetus for her Kentucky UCC filing statement. (Gov. Ex. 201; Tr. 102, May 23, 2016 p.m.) In other words, Defendant went from discussing "debt elimination" and contemplating bankruptcy in December 2009 to spending more than $81,000 in May 2010 alone.[8] These spending habits reflect Defendant's clear awareness that she should spend this money now or risk losing it in the future.

Defendant argues that she spent this money only on "everyday items," not "lavish gift[s] or frills for herself," to suggest that she did not know the money had been falsely obtained. [47, at 5.] Defendant's underlying premise is, at best, dubious, considering that Defendant spent this refund check on plane tickets and rental cars, makeup and cosmetic treatments, art, jewelry, and thousands of dollars' worth of goods from Walmart, Kohl's, Menards, and Lowe's. (Gov. Exs. 602 & 604); see *United States v. Jackson*, 540 F.3d 578, 596 (7th Cir. 2008) (finding knowledge and intent defraud shown, in part, by "spen[ding] a good deal of the money in a short period of time on frills such as expensive jewelry, a honeymoon to a resort in Jamaica, and new furniture"). She wrote a $8,400 check to her apartment building—an amount several times greater than her rent. (Gov. 306 at 27; Tr. 113, 166, May 23, 2016 p.m.) She wrote checks totaling $17,000 and $10,000 to her husband and son, helped her son purchase a car, and wrote a $20,000 check to cover her mother's home repairs. (Gov. Ex. 306; Tr. 111–15, May 23, 2016

---

[8] It is not difficult to conclude that Defendant and Bey opted to pursue this false tax return scheme to help Defendant "eliminate" her debts rather than stick with their nonsensical UCC filing strategy.

15

p.m.) And none of this accounts for how Defendant spent the hundreds of dollars in cash that she withdrew every few days during this period. (Gov. Exs. 602 & 604.) But even if Defendant were correct that she spent this money on "everyday items," this would not matter. See *Jackson*, 540 F.3d at 596 (explaining that failure to "go on a spending spree or purchase big ticket items does not exculpate" a defendant from acting knowingly). Sending lavish gifts to family members or making banal purchases does not absolve a defendant of guilty knowledge. Here, Defendant's "spend-it-or-lose-it" approach to this six-figure windfall right after she was considering bankruptcy shows that Defendant realized the fraudulent origin of her new wealth.

In addition, Defendant's conduct when filing her tax returns shows that she knew that she was not entitled to his refund. Defendant had a multi-year relationship with H&R Block, which she relied on for assistance with filing her 2006, 2007, and 2008 tax returns for both personal and business income. In January 2010, Defendant momentarily abandoned H&R Block and turned to Bey for help with the 2009 Form 1041. Yet, one month later, Defendant returned to H&R Block for assistance with filing her 2009 Form 1040A for her personal income taxes—never discussing nor disclosing anything related to the purported trust income, fiduciary fees, or Form 1041 with H&R Block. Far from suggesting that Defendant believed Bey was a "legitimate business account" whom she would rely on for tax advice going forward [47, at 7, 8], Defendant's prompt return to H&R Block for her personal tax returns shows that she intentionally segregated the activities related to her fake tax return from her ordinary tax returns with H&R Block. Moreover, Defendant paid H&R Block only $242 for its tax preparation services, but paid Bey—whom she met at a Starbucks—$11,500. (Gov. Exs. 101 at 5, 306 at 11, 309 at 104; Tr. 89, May 23, 2016 p.m.) This one payment to Bey was $4,000 more than Defendant's entire adjusted

16

gross income in 2008. (See Gov. Ex. 103.) Defendant offers no argument as to how she could have thought this exorbitant fee was legitimate based on her prior experiences.

Likewise, Defendant did not contact H&R Block in March 2010 after she received the $135,000 refund check. (Tr. 92–93, May 23, 2016 p.m.) Instead, her first call was to Bey, which is significant for two reasons. (Tr. 96, May 23, 2016 p.m.) First, the fact that Defendant did not even ask H&R Block about why she had received a refund check 33 times larger than the $4,041 she requested on her 2009 Form 1040A strongly suggests that Defendant realized this refund was illegitimate. (Gov. Ex. 118.) Failing to contact H&R Block shows a deliberate effort to hide these proceeds from a reputable tax preparer and preserve the separation between her bona fide H&R Block-prepared tax returns and the illegal refund scheme.

Second, this conduct is fatal to Defendant's argument that Bey stole her identity and filed the Form 1041 without her knowledge or permission. [See, *e.g.*, 44 at 4, 6.] Let's assume for the moment that Defendant did not know about the Form 1041. In that case, the only tax returns that Defendant knew about were prepared by H&R Block. From Defendant's perspective, only H&R Block could have explained why she had received an enormous tax refund. Nothing should have caused her to associate this tax refund with Bey, who—as far as she knew—had no involvement with any of her filed tax returns. But Defendant did call Bey—not H&R Block—when she received the refund check, which means that Defendant must have known of Bey's involvement with this false tax refund. This conclusion is bolstered by (1) Defendant's decision to meet Bey Defendant at Chase Bank shortly after this call; (2) Bey's assistance with setting up the trust account that Defendant needed to cash the refund check; and (3) Defendant's $11,500 payment to Bey roughly one week after cashing the check—all of which are inconsistent with the notion that Bey had filed a false tax refund under her name without her knowledge.

Defendant's identity theft argument is further undermined by her close coordination with Bey between December 2009 and July 2010 on the UCC filing (where the secured party is "Cheryl Spear:Bey"), the "Deed of Trust Contract" (which Bey prepared so that Defendant could open a trust checking account), opening the trust account in Chicago (not Florida, where she was living at the time), and the stamped response on the IRS's June 16 frivolous filing letter (in contrast how she worked with the IRS to resolve the unreported retirement income on her personal income taxes). (Gov. Exs. 108, 201, 307; Tr. 122–23, May 23, 2016 p.m.) Defendant never explains why, as the Government argues, Bey would have stolen her identity and then given her over 90 percent of the proceeds from the scam. And while both sides debate whether Defendant knew about the Moorish Science Temple's association with fraudulent tax scams, the issue here is whether Defendant realized that her tax refund check was false and was aware that endorsing the check would cause the government to pay her thousands of dollars to which she was not entitled. The only reasonable inference from these facts is that Defendant knew about the false Form 1041 when she received the false refund check, which dooms any argument that Defendant acted through "ignorance, mistake, or accident" when she endorsed and cashed this check. 7th Cir. Pattern Instruction 4.10 at 50.

Finally, Defendant's false and shifting explanations to Agent Umali about the refund check provide "additional circumstantial evidence of guilt." *United States v. Rose*, 12 F.3d 1414, 1421 (7th Cir. 1994). Defendant told Agent Umali that she had purchased her tow truck for $80,000 or $90,000, even though she had actually purchased it for $20,000 in 2007. (Gov. Exs. 401; Tr. 68–72, May 23, 2016 a.m.) She claimed that she had never filed a tax return for her towing business and hoped to "recoup some funds by doing * * * a tax write-off for the loss" from that business, even though she already declared a $2,900 loss for her company in her 2007

18

tax return. (Gov. Ex. 102 at 7; Tr. 94, May 23, 2016 p.m.) She claimed that Bey offered to help with a $20,000 to $30,000 tax refund and "actually received" a $75,000 or $80,000 refund "by writing off the loss from her business." (Tr. 87–90, May 23, 2016 p.m.) In reality, this 2009 refund check was for $135,000, was made out to her in her capacity as "trustee" of the "Cheryl Spear" trust, and had nothing to do with her modest 2007 business losses.[9] Similarly, the amount she claimed to pay Bey fluctuated over time: first $35,000 total for Bey and an associate, then $13,700 total, and ultimately $11,500. (Tr. 93–94, 98, 108–10, May 23, 2016 p.m.) She also originally told Agent Umali that Bey mailed had the refund check to her in Florida (as no one was living in her Illinois address in March 2010), but later told him that her son mailed her the check while he was living at her address. (Tr. 91, 95–96, May 23, 2016 p.m.) These untrue or inconsistent explanations attempted to conceal refund check's illegitimacy and are further evidence of Defendant's consciousness of guilt. See *United States v. Shorter*, 54 F.3d 1248, 1260 (7th Cir. 1995); *United States v. Perez*, 790 F. Supp. 2d 824, 827 (N.D. Ill. 2011).

For these reasons, the Court concludes that the evidence establishes, beyond a reasonable doubt, that Defendant knowingly presented a false claim to the IRS for $135,000 in the form of a false tax refund check.

    **2.**    **Count Two**

Like Count One, Defendant does not dispute that the Government has proven beyond a reasonable doubt that (1) the $135,000 from the federal income tax refund check belonged to the United States Department of Treasury, (2) this amount exceeds $1,000 in value, (3) Defendant converted this refund to her own use, and (4) Defendant deprived the true owner (the United States) of the use or benefit of this money. [44, at 2.] Defendant's argument again turns on "the

---

[9] Defendant never explained how she could have mistakenly thought she purchased the used truck for $80,000 or why she told Agent Umali that this was the basis for her refund. (Tr. 94, May 23, 2016 p.m.)

19

knowledge elements": whether Defendant *knowingly* converted money belonging to the United States to her own use and did so *knowingly with intent to deprive* the United States of the use or benefit of that money. *Id.* at 13. Defendant makes no specific arguments about her knowledge for Count Two, explaining "if [Defendant] is found guilty of making a knowing false claim against the IRS, it would necessarily follow that she would clearly be converting the money she obtained through the refund check she received from the Treasury Department." *Id.*; [see also 47, at 9.] The Government agrees, incorporating its arguments from Count One [45, at 28–29] and further emphasizing that the speed with which Defendant spent this entire sum shows her "intent to deprive" the United States of the money's use or benefit.

The Court agrees that, for all the reasons stated above with respect to Count One, the evidence establishes beyond a reasonable doubt that Defendant acted knowingly for purposes of Count Two. Defendant knowingly converted the false refund to her own use or benefit when she negotiated the $135,000 check and spent all of this money on expenses and gifts for herself and her family members. Defendant acted knowingly with the intent to deprive the United States of this money's use or benefit when she negotiated the false refund check, spent the full amount within three months, and attempted to conceal the origins of this refund check from the IRS.

### III. Conclusion

For these reasons, the Court concludes that the Government's evidence is sufficient to sustain convictions on Counts One and Two of the Indictment. This matter is set for status hearing on December 1, 2016 at 9:00 a.m.

Dated: November 9, 2016

_____
Robert M. Dow, Jr.
United States District Judge